We'll hear from Ms. Hill. May it please the Court, my name is Cynthia Hill, and I am honored to represent Bell Helicopter here today. In 2008, Bell Helicopter was forced to lay off over 500 people. Let me ask you this. If we agree with you that the injunction is overbroad, what is the proper resolution of that? What do we do? If we agree that the injunction is overbroad, there are two options, Your Honor. I would say that in this particular case, not only is the injunction overbroad, but the request for injunction was waived, and in this particular case there is absolutely no reason for an injunction. But she asked you what happened. Okay, so let's just say that the only problem, let's say that the only problem we decide with it, we think there's evidence to support the question number one, we think this and that wasn't waived and all that. So let's say all of that is put aside for the moment. We're just talking about overbreadth. What is the remedy for an overbroad injunction? In this particular case, I would say we would reverse and render. Alternatively, there— Why wouldn't you remand? I would not remand in this particular case, Your Honor, because as Your Honor has probably seen in the briefs, what we have here is we have a former employee. Going back and sending—there is not a—is a former employee who's worked for our biggest competitor for eight years. There's not an injunction that can be formed that would be very effective in resolving this situation involved in this particular case. Mr. Peterson isn't applying for—unlike in other cases, for instance, in the Wolf case or some of the cases that this Court has considered, this isn't a case where he's going to come back and he's going to reapply for jobs or he's going to look for promotions or he's going to be subject to layoff. This is a guy who's working for our biggest competitor who doesn't need an injunction to enforce his rights. And so we're to—in his theory, you guys keep doing this to people. You did it over in the Eleventh Circuit. Now you're in the Fifth, and so now you're going to go do it in the Eighth or something and run amok. And his argument is we need to kind of put a stop to that. Well, his argument is that we need to kind of put a stop to that, and that's why we have the EEOC. If we have an injunction that says Bell may not discriminate on the basis of age anymore, then basically we're usurping all of the rights in the— Are you aware of any case under the TCHRA that has approved an injunction like that? No, ma'am, I am not. There have been three recent cases under the TCHR, including the Wolf case, which I believe is heavily cited in the plaintiff's brief. In the Wolf case, that was an individual who was continuing to work for the Texas Commission on Health and Human Services and was continuing to apply for jobs. In that particular case, the injunction was that gender should not be considered in any additional employment decisions with regard to that plaintiff. In the other cases that are cited in our brief, the Becerra case as well as the Clayhorn case, both of those cases the court said we don't have a need for an injunction in this case. There's not been—I have not found a case under the Texas Commission on Human Rights that has issued any sort of injunction, prospective injunction, for anyone for—you may not go out and discriminate against. How, if at all, would the injunction in Bowe Brothers fit into this situation? The injunction in Bowe Brothers—the Bowe Brothers case was a case brought with the EEOC, not an individual plaintiff. In that case, there were individuals who were continuing to work there. In the Bowe Brothers case, there was a 15-page injunction that had very specific reporting and reporting requirements to the EEOC, had all sorts of very specific and—how can I put this—measurable conduct, besides just don't go in and discriminate in it. Okay, so your argument is, I guess, that where the plaintiff is an individual who isn't going to be coming back to this employer, they don't really have standing to get some general Bowe—well, specific even. Bowe Brothers-esque injunction that lays out some plan for the future to remedy the other 5,000 employees, they don't have standing if they're not going to come back. That's your argument. So really, whether broad or specific wouldn't matter for Peterson. Yes, ma'am. And that's why I was trying to—that's why I got off—and please excuse me for that. But in our particular case, we have a situation where Mr. Peterson doesn't work there. Bell has layoffs all the time. They're going through layoffs right now. The way the injunction is, is that you can't consider age in— No, I think it's overbroad. I'm just trying to figure out in my head whether—because the district court was asked to give a more specific injunction. It said, no, I've got—I'll got this, and then did this in my view with respect to the able district judge, a very overbroad injunction. But that said, then I think, well, do we give the judge another shot, or do we say, well, the judge, you already had your shot. This is what you did, and this is too broad, and they're really—it's frankly unenforceable. Well, how can you know he's not going to reapply? He may get laid off at the new job. Maybe his sales expertise isn't so great. He's not going to be a good performer. He might need to seek reemployment. Well, we don't have—in this particular case, we don't have an injunction that says that we can't discriminate against Mr. Peterson. It says that we can't have age as any sort of consideration. And that's a problem because also, on the other side, Bell has responsibilities under the Older Workers Benefit Protection Act, as well as responsibilities as a government contractor. The way the injunction is written, it is, you cannot consider age. What if Bell gets back in a particular group, and there's an adverse impact on an age group, and they send it back and say, listen, this is just unacceptable? Well, then the way the injunction is written, you're basically considering age on the other side. Who would have standing to enforce that injunction if Mr. Bell was a plaintiff? I mean, yeah, Peterson was a person who is a plaintiff. Well, and that's the problem. The people who would have the—Mr. Peterson is basically like the roving arbiter of whether or not Bell is discriminated against in future layoffs. And, you know, frankly, since Mr. Peterson has left, there's probably been six layoffs at Bell. There were two the year that he was there. Okay, so let's assume that it's overbroad, it's difficult or impossible to fashion something that wouldn't be. Then we have the problem that if we overrule your point that there was no evidence to support the answer to question one, then we have an act of discrimination that the Texas Act wants to have remedied, but no remedy. Your Honor, that's exactly the situation they found themselves in in the Becerra case as well as the Craig case, Claymore case. In those cases, there was a mixed mode of submission, and the answer to question one was, yes, it was a motivating factor. Once again, we obviously don't agree that it was a motivating factor here, but that was the same argument there. And in that particular case and both of those cases, the Texas Court of Appeals, which both of those were petition denied cases, are the most recent cases that we have under the Texas Commission on Human Rights Act. In both of those situations, the court said, yeah, well, having this sort of, yes, you proved it, but you don't get an injunction in this particular case because you have not proven. And also, I'm sorry, the Jones case was another situation, the Jones v. Jefferson County case, where they had a situation, the same thing. The court said, yes, we've got a yes on the mixed motive, but we do not have enough here, and we do not have a reason to have an injunction issued in these particular cases. And in those cases, there was no attorney's fees. Well, let me, my understanding is that Bell did not appeal a declaratory judgment. And there was no declaratory judgment issued, Your Honor. Well, what do you mean by that? There was, none was entered? No, ma'am. No, ma'am. There was not, it was not requested, just like the injunction was not requested. Well, I understand that, but I mean, did the judge grant a declaratory judgment along with the injunction? No, he did not, Your Honor. Okay. I misunderstood then. So what would be the consequence for attorney's fees if we were to vacate the injunction? No attorney's fees would be recoverable under the Texas Commission on Human Rights Act. And that goes with, and I know the court is maybe not as concerned about our waiver argument, but this is what we're here, the bottom line is today. Injunction didn't come up during the trial. It didn't come up during the pretrial. It didn't, it was not in the initial motion for judgment that was during the court. It only came up a month afterwards when, when counsel, counsel filed a motion for fees. And at that point, it was, uh-oh, I can't get fees if I don't have an injunction. And that was the first time we've ever talked about an injunction in this case. Yeah, but, you know, Rule 54C, I mean, it's kind of weird, really, but there it is. It kind of says you grant the relief the part he's entitled to. Yeah. You know, so if he's entitled to it, he's entitled to it. That, you know, frankly, I had never really focused on 54C until this case, and it's a little startling, but that's the rule. That is a rule that you can, the court may do that. In this particular case, and I think this case is so hard because even the jury had questions. If you go back, the jury didn't say, if we don't find any age discrimination, can we still give him some fees? They wanted to give him something. I don't understand how the testimony from that other fellow from the 11th Circuit got into the case. Your Honor, I don't understand either. But you didn't appeal that. No, ma'am, we did not. But you did argue against it. Yes, ma'am, we did. We argued against it. That is especially true insofar as the individuals from the other case. That happened five to ten years before the case in question. The people that were supposedly the bad actor in the 11th Circuit case left Bell in 2004. That was direct discrimination, wasn't it? It was not a riff. Yes, ma'am. It was not a reduction in force. I'm just sort of mystified because we have cases that say that ordinarily when you have these big nationwide entities, you cannot introduce that evidence of alleged discrimination in another territory with other bosses and so on is not relevant to discrimination in another case. Yes, ma'am. We had filed both a motion to eliminate it and a motion to keep that out. We argued it very strenuously, and Judge Means, who I usually have no question about his rulings, did not go with me on that one. Well, there was something offensive here because the jury was offended and the judge was offended. So somebody at your shop did something, not your law firm but your client, did something offensive. That's pretty clear to me. I think, Your Honor, I think what the problem was is this was not a bad employee. No one said Mr. Peterson was a bad employee. But for the fact that Bell lost a major contract, he wouldn't have been laid off. And nobody in the sales and marketing department wanted to lay off any salesmen. According to them, man, that's who's driving it. And they were very passionate about that. As a result, I think there was some confusion which of the two bosses made the actual decision. And I think— Well, I say neither one. Well, no, they say neither one. The undisputed evidence was they were given a roster. They had meetings. They returned the roster with Mr. Peterson's name marked off on it. So—and there's nobody else that they said made the decision. So you're contending it's one of those two individuals? Yes, ma'am. The boss or the boss's boss? Or the boss's boss. Yes, ma'am. And those are the people that Mr. Peterson testified did not discriminate against? Yes, ma'am. Those are the two people that Mr. Peterson said did not discriminate against him. And Mr. Peterson's boss is also the one who did all of the performance evaluations for everybody in his group, from the 37-year-old to the 61-year-old. Mr. Peterson was right in the middle age-wise. With regard to Ms. Eaton, the person that Mr. Peterson most closely compares himself to, and I think it may have been lost in the plaintiff's briefing she was referred to as young, and being a woman well into my protected age, I might think she's young, but she was in her 40s. She was not a 22-year-old. She had worked for Sikorsky, their biggest competitor, for 16 years. She was a fixed-wing pilot. She came to Bell. She had been at Bell for some time. How much younger than Peterson was she? She was, I believe, seven years younger than Mr. Peterson. I'm sorry, does the court— On the attorney's fees, I think you objected to the amount of the attorney's fees. In what respect do you think that they're infirm? Well, I have several problems with the attorney's fees. First of all, I don't think they should get any attorney's fees because I don't think the injunction is— I understand that. But besides that, what we had here is we had a case that was brought under the ADA and the Texas Commission on Human Rights Act, as well as several contract claims. The primary focus of this case from the beginning had been the contract claims, whether it were commissions that Mr. Peterson was due. The majority of those were knocked out on summary judgment. The ADA claim was knocked out on summary judgment, and the few remaining contract claims had been settled well before trial with no fees. Both sides would bear their fees on that. So my concern is initially, you know, the plaintiff's counsel was seeking over $500,000 for a zero-verdict case, and I understand that there doesn't have to be direct proportionality, but that just seemed shocking to the cons. Now, even though that's been knocked down to $350,000, we have $350,000 on a case that, first, from our point of view, is not— there was no age discrimination to begin with, and the only reason we have it is a post-judgment request for injunction. Right. Okay. You have time for rebuttal. Thank you. All righty. Mr. Gillespie? Your Honor, thank you very much for hearing us today. I want to start off just by clearing up something the counsel said. She said that the court did not award declaratory judgment, and that's incorrect. Tab 4 of her brief—I'm sorry, of her record excerpts is the order partially granting motion for judgment. It says, nevertheless, the court agrees that plaintiff's request for declaratory and injunctive relief should be granted. What's the declaration? Well, that's harder to figure out. Okay, but you didn't get a declaratory judgment. If nothing's declared, you didn't get a declaratory judgment. Well, I think there is something declared, and it's in the next order. Nevertheless, defendant Bell Helicopter Textron violated—this is the order that's at tab 5— violated Peterson's rights under Chapter 21 of the Texas Labor Code and engaged in unlawful age discrimination when it considered Peterson's age as a motivating factor in his decision to terminate his employment as part of the 2008 reduction in force. I think that's the declaration. Now, that goes to your very first question, though, which was what do you do if the injunctive relief was not sufficiently tailored? Well, that's just based on the jury verdict, though, isn't it? Well, I think it— I never heard— No, I don't think it's just based on—it is—without the jury verdict, we wouldn't get that declaration. Right. But we did get that declaration, and so I think that's what a declaration is. It could be longer. It could go into more detail. And it ties in with the injunctive relief because we— So let's talk about that. Try to—I mean, you keep talking about Bowe Brothers, and it was really shocking to me because I remembered Bowe Brothers without even looking it up, and I thought, well, the Bowe Brothers injunction went on forever. And so I went back and looked it up, and it went on forever versus don't discriminate based on age. I mean, how would you even enforce that? When you enter an injunction as a judge, it has to be enforceable, something you can bring someone in and hold them in contempt. And this thing, it couldn't be broader. Don't be bad would be the only thing broader. This is especially with respect to hiring—with respect to decisions in risks. I guess that's the only way it narrowed. But, Your Honor— They already had a program in place where after the rift, they sit down and look and see if it does disparately impact anybody. So they already had that program. So what else are they going to do? Imagine a situation where the plaintiff wins, gets a $10 million verdict, and the decision on appeal is that was too much, and so the answer is because it was too much, you get zero. And so that's what they're really arguing here. I asked for specific injunctive relief, and I had read Bowe Brothers. So I— When did you first— Actually, I don't think I had read—I think Bowe Brothers came out after me. When did you first ask for injunctive relief? After we got the award. I mean, I— Isn't it correct that at least three other circuits have said that if it never came up during the trial and pretrial proceedings, that it's too late? Fifth Circuit—I think that may be right. The Fifth Circuit's never held that. The Eleventh Circuit goes with us on this. No, but what the Fifth Circuit did hold in the Sapp case was the Fifth Circuit talked about situations where a party may be awarded the damages established by the pleadings or the facts proven at trial, even though only injunctive relief was demanded in the complaint. And so that was the opposite, where injunction was pled, and then the trial revealed damages, and so 54C was—in other words, my view of 54C, and I think Sapp footnote 3 confirms it is, it's okay for the court to go beyond the pleadings when the parties have in effect tried the justification for further relief. But here, there's no trial, but there's no series of findings that supports this injunction. Your Honor, Rule 54C says what it says, and it's very explicit. And it says should, not may, should grant the relief they're entitled to. And the facts were tried. One of the things that they—the reply brief, they get the last word, so I'd like to be able to say a few things about what they said in the reply brief. One of the things they said in the reply brief was that they did prove a training. And bear in mind what Judge Fitzwater, if you would, what Judge Fitzwater said about there has to be clear and convincing proof of no—that it probably will not happen again, or else injunctive relief is mandatory. I think that's the standard in the Fifth Circuit. So what Bell said in their brief is that they have sufficient training on this. Well, I've got with me the pages that they cited in the reply brief, and if you'll look at the record, pages 3404 through 3408, that's what they're referring to. It doesn't have—it didn't come close to being that test. Okay, but does he have standing really to solve the world's problems? Under the Texas statute, he does. The Texas Labor Code 21.125B, really the question the Fifth Circuit's wrestling with here, I think, is whether or not to rewrite Texas law, because Texas law says the district judge has got this authority. The Wolf case did it. The Wolf case, there was an injunction. It was for one person. But here, one of the questions Judge Crone asked, the question, is it for sure that he's not ever going to come back? Well, of course it's not for sure. He was—Tab C is our tab on that. Tab C shows that he was eligible for rehire. He was told— Three years. Sorry? For three years, I thought. No, just eligible for rehire. Forever? Yes. And he was a great employee. He's still sewing helicopters. He's old, but that shouldn't be a problem. Okay, so why not an injunction that says if Mr. Peterson reapplies, do not consider his age? Well, I think that the way the injunction should be fashioned should be up to the district court, but I would like the district— Okay, the district court had their shot. Well, that's what— You asked for something more specific, and the district judge said, no, I got this, everyone, and went out and did—I mean, again, I have a lot of regard for Judge Means, but this injunction is, in my humble opinion, way overbroad. I would ask this court to fashion it, then. I look at pages 1995, 1996 of the record. That's where I asked for specific relief. And some of it was pretty doggone good, in my humble opinion. I asked the judge to order them for the next five years, Bell would report to the Texas Workforce Commission on a quarterly basis the following information, and it lists a series of things. One of those things, item number six, is part of what this whole case is about. This case is about accountability. Item number six on D says— With due respect, sir, I think this case is about attorney's fees at this point in time, and I know you persuaded the jury that they discriminated against him on the basis of age, and I think you did it with evidence that would not be admissible normally in our court, and, you know, good for you, but you didn't even ask for injunctive relief until it was clear you had a zero verdict. I want to answer your question. I respectfully disagree that this is about attorney's fees. I understand. We want our attorney's fees. Is it your usual practice to seek injunctive relief after the judgment has been entered? You know, I'd rather—I'd never run into this before. That's right. Literally. So the answer to your question is no. I had never been in a situation where we had won on question one and lost on question two. Never happened to me before. And, in fact, part of the reason that happened was 90 days before trial, they filed a motion for leave to amend, which we opposed, but they got in anyway. They got to amend their claim to make it a mixed motive case, and they had not pled that. They had not pled that affirmative defense. We didn't have time to amend our pleadings again. We were right before trial. The question you ask about whether or not this was tried and won based on facts that weren't admissible, I respectfully disagree. That wasn't appealed. I would have been happy to brief it. I understand that, and I'm sorry, but it was just an irresistible urge based on reading the brief. Well, the judge, I think, made the right ruling on that. He's been questioned about it by counsel, even though she didn't appeal. But the judge means did rule on that. I don't want you to get off on a red herring, so excuse, you know— Thank you. But let me— Can I—I'm sorry. Let me just point out a technical thing that the parties did not address. In a case called McLean v. Lufkin Industries, we vacated an injunction that required Lufkin to cease and desist all racially-based assignment and promotion practices, create and implement a program to ensure the black employees receive an equitable proportion of promotions, and take all necessary steps to remedy the effects of past discrimination. That was under federal law, under Title VII, in a case in which there was found to be systemic racial discrimination by the company against numerous employees. This is a case involving one plaintiff. The question I had when reviewing this was whether the terms of an injunction and the standards for an injunction in the federal court are governed by Rule 65 or by substantive Texas law. They're governed by Texas law, Your Honor. I think you're wrong about that, but nobody bothered to brief that to us. But, I mean, so I'm—if you want to file a letter of brief— I think we implicitly did. Huh? Pardon? I think we implicitly did because we talked about the fact that this injunction was specifically granted under Texas Labor Code 21.125B. Well, and all the Labor—correct. And all the Labor Code says is that the court may do it, and then you have a series of cases going one way or another about the propriety of it. Could I address a point that counsel made in a reply brief? She also made it in her statement to you today, that this is just a—that mock was a verdict from a jury across the country, a verdict in an unrelated case. That doesn't do the evidence in this case justice, and it ties in with why we were able to get this testimony in before the court. We had witnesses, Gary Mock, Rick Nickerson by deposition, Fred Koenig in person, John Sorter by deposition. Actually, Nickerson was present personally, and Dave Peterson. These people tied together. They literally had a guy named Craig Manning who set the groundwork for all this. And when the question was asked whether or not mock was a direct evidence case, that's not right. I tried mock. I know what the case was about. The case was about a guy who was called in and was told you're being terminated, and he asked 12 times during the course of that conversation why, and they never would answer. Well, what I meant to—all I meant to say there was it was different from a RIF case. I think it may have been a RIF case. They never would come—excuse me, Your Honor, they would not come clean. This is the same M.O., and this is why the judge properly ruled that this evidence was admissible. They used the same M.O. They won't tell you why. This case is about accountability. Let me ask you this. Was he the lowest rated guy for those two years of his group or not? By fractions. Okay. But that's a different reason. So if he is, then why can't they—you know, his boss didn't want to lay anybody off. His boss's boss didn't want to lay everybody off. They're all pals. They like Peterson. He's a good guy. He's a good man. He's a good employee. But they've got to lay off somebody, and he has the lowest score. Why is that a Fifth Circuit case? Your Honor, their reply brief says the one and only—this is on page 4— the one and only reason ever proffered by Bell as to Peterson's inclusion for the layoff was that he had the lowest performance evaluation scores in his group for the years immediately preceding the reduction in force. That's not true. Burrell says that if you change the reasons, then we've got evidence of pretext. If you'll look at—I do plaintiff's law, and when I start a case, I frequently will— question number one will be state the reason for the termination, and question number two will be who made the decision. Tab D is their sworn answer to that. Tab D says the decision to include Mr. Peterson in the reduction in force was based solely on his declining performance. Not only did they change that reason, they changed it because that reason was false. His performance was not declining. Then question two was— Declining as compared to much earlier years when he'd won all these awards. No, declining during those years. No, I'm talking about maybe those two years, it was maybe an uptick on the second year, but that it was overall not as good as he'd had in the past. Not those two years, but say five years before, six years before. Well, they were talking about 2006 and 2007. I know, but that's not my question. At a decline from his—the zenith of his performance earlier when he was winning these awards, getting plaques. You know, they had no evidence that it was declining over those years. He was on his way to win an award that year. He was—part of our evidence is— But are you disputing that he was evaluated and he was the lowest-ranking person on the evaluation for the sales department those two years? In those two years, when you're talking about the scores, you're talking about fractions of a point. Right. You're talking about everyone on the chart, but not everyone was rated, literally. Some of the younger people weren't even rated. And part of our evidence— Did they keep anybody older than him? I don't know. Quite frankly, there's a guy named Ringer who may have survived a little while, but he didn't survive long. But, I mean, doesn't that matter if the idea is that their MO is to go around firing the oldest guys? If he and the oldest guy, then— What matters is that they kept the younger people, and Peter— He had higher scores. Slightly, but his weren't declining. And, again, they came up with—they literally gave a sworn answer that they changed, and that was untrue. They said solely. If you would look at tab L, that's Peterson's testimony, on page 3143, the day he was fired, the guy who fired him was a guy named Moreland. And please don't accept their theory that it was either Moreland or Fitzpatrick, because the sworn testimony from both of them was it wasn't me. I kid you not. That's what they both said under oath. And on tab L, this is testimony you've got to accept, because it's in our favor. We won this one. And so on page 3143, Peterson testified that Moreland tells him, Dave, I don't know what they're doing. You're my best guy, but you're on the list to be laid off. And it's not related to performance at all. That was his testimony. You have to believe it on appeal. Then Fitzpatrick said, and this is on page 3063, did you make the decisions as to the number of people from each organization to be selected? Answer, no. The HR department told us the number of people that we needed to get and who. That was Fitzpatrick's sworn testimony. The sworn testimony of Moreland was, I understand that you communicated the termination decision. Bell is identifying you as the person who made the termination decision. Is that accurate? No, it's not. That's his testimony on page 3012. Now, they've suggested that they should win on appeal because maybe Moreland was lying at trial, because by the time of trial, he and Peterson were coworkers. But he's the guy who told Peterson on the day of the termination, I don't know why, you're my best guy. So at that point, he was Peterson's boss. And besides that, you can't decide that Moreland was lying at trial. That's just not the way it works on appeal. Your Honor, we've got a list of reasons why this is a case that you should be hearing as a federal court case or as a Texas Commission on Human Rights case, because there is a series of pretexts. I'll run through them. All right, but I guess I get back to if we spot you, question one, I'm still not sure. You may have a wrong without a remedy, because I'm still struggling with what the remedy is. It should be, I think it's governed by fairness, and it's governed by the purpose of the act. And I think that this Court might try its hand at fashioning appropriate remedies, and if you would, then you'd look at pages 1995 and 1996. I don't have, literally, I don't have time to read them to you. But some of them were very good, I thought. Actually, why wouldn't we look at Jones v. Jefferson County, assuming Texas law, not federal law, applies, but this is consistent here, as a general rule, in order to obtain injunctive relief, an applicant must establish the existence of a wrongful act, imminent harm, irreparable injury, and the absence of an adequate remedy at law. That's because that is not a 21.125B case. 21.125B permits the judge, in his discretion, to issue an injunction. And here, this judge did that. I'm sorry, but I believe it was a 21.125 case. I wouldn't have cited it to you just to make it up. It's Court of Appeals, Texarkana, 2015, Southwest, 3rd, 206. I apologize, but I'm going to go with the Austin Court of Civil Appeals on this one, because that's exactly what the Austin Court of Civil Appeals did, and that's what the statute says. Okay, but injunctions have, the term injunction has meaning as an equitable remedy, and they didn't also list the fact that unclean hands might be a defense and whatever, whatever, but we know that to be the case. So injunctions, I mean, I practiced Texas law for a really long time, and I don't remember Texas law and injunctions being some weird animal compared to federal or anybody else. But you made an important point, where you said, what happens if they just keep doing this thing? Well, that's why we have the EEOC. Well, that's why we got the Texas Commission on Human Rights. To get an injunction under 21.25b, you don't have to meet those four statutory standards. No, you don't. It's within the discretion. The factors that are typically recognized. That is our position. Either federal or state court. The statute doesn't say it, and wolf, they didn't do it, and you'd probably never have that. You'd probably never have that. I mean, what you've got is a remedy that's, think about the scheme here. It's important not to commit age discrimination, sex discrimination, race discrimination. It's important not to do that. Well, unfortunately, all we have, I mean, you're trying to put this picture in a larger frame. Because what we have at best is a jury verdict that Bell was motivated to discriminate against Mr. Peterson by his age. We do not have a jury verdict that Bell was discriminating against all older former pilots in the sales force. But the jury had before it the testimony that the judge had. The judge had the testimony of a series of people who came in. Yeah, but they didn't know you were trying to get a broad injunction, so they didn't bring in all their testimony about the thousands of old people still working there. I mean, that's their argument. I'm putting that in quotes. I'm putting that in quotes. And old can mean whatever you want it to mean. But in quotes. That's their argument, that they would have shown older than Mr. Peterson. The judge could have reopened the proceedings. He didn't do that. He had heard that evidence. He had heard the evidence of a series of people. Okay, but the point is he heard the evidence presented on the pleadings presented and not, if they had known there was going to be some broad injunction covering their whole company for time immemorial rather than damages to Mr. Peterson, they would have brought in however many, if they had them, thousands of 50-somethings or whatever that are older than Mr. Peterson to say, yeah, I'm still here. I'm rocking and whatever. Or not, right? That's not what happens with their sales force. They wean them out when they get older. Okay, well, that's the evidence that would have been presented, right? And maybe we have to have a remand to deal with that. What you can't do, though, is to say you won, but because your remedy was too broad, you get no remedy at all. Your Honor, I think that would disturb the purpose of the statute. And I think sooner or later a company – can I say one more thing? Well, your time is really run off. I know. May I just say one more thing? One more thing. In the Turner case, the Fifth Circuit case, the court said you've got to identify the decision maker. You've gone four years, you never identified it. I think under the statutes, you've got – if you don't identify the decision maker, you've got to lose. And the reason for that is you can never be accountable. You can just make up anything you want. Thank you, sir. Thank you very much, your Honor. Thank you. What evidence would you put on if you'd known they were seeking an injunction against your whole company for everything, time immemorial, not just damages for Mr. Peterson? I would have, for one thing, put on the older salespeople we had kept, including Mr. Colson, and I would have also put on the fact that Mr. Fitzgerald was also older, and I would have put on a plethora of people who are older. Bell House, one of the – and I'm sorry, being in the protected group myself, I'm going to just say – I think we're all in the protected group here. Bell is an older workforce. Okay. Bell House, people who have worked there for 50, 60 years. We actually had someone who worked there for 60 years. This is not a workforce where we weed out the younger people. Mr. Peterson wasn't thrown out and brought in some youngster. Mr. Peterson was replaced by a woman who was in her 40s, who was really good. And was already there. And was already there. They didn't replace him at all. They split his jobs up. She took most of his territory because she was already in the Northeast. Mr. Peterson's folks that he had testify to the point. Okay, but the point is, whatever the merits of this, whether you have a million, you know, hundred-year-old people working there, you didn't get to put on that evidence because you didn't know you needed to because you thought you're trying Peterson. Yes, Your Honor. That's the bottom line on the prejudice, even accepting 54C and don't have to plead it and all that. That's your argument on prejudice? That is. Yes. And I would . . . Your Honor, Justice Jones, the . . . I'm sorry. Justice Jones, the . . . In our brief, we did talk about the Jones case, as we talked about. And also, you were asking what the standard would be in the federal courts, and we cited the May case. No, I say . . . I understand that. But which standard . . . This is like an eerie question to me. And do . . . Are we more . . . You have a vague language in the Texas statute authorizing an injunction, so do we go under Rule 65 or do we look to the authorities under Texas law? I think that we would look to the authorities under federal law in this particular case. The cases are pretty standard that in the absence of any compelling . . . I mean, controlling Texas law under the Texas Commission on Human Rights Act, we looked at Title VII cases. Well, I just . . . I don't think Texas has anything weird about injunctions. I mean, I just . . . That's news to me after coming up on 30 years of Texas law. I'm amazed at the idea that Texas has some unique version of injunctions. And, Your Honor, we would agree with that because if you look at the Jones case, with the Jones v. Jefferson County case, in that particular case, there wasn't any sort of strange Texas standard. In that particular case, they still held you to the standard . . . Well, but Mr. Gillespie cited a couple ones that are arguably contrary, didn't he? Mr. Gillespie cited the one case, and that was the Wolf case. Well, we have one versus one, so . . . No, I'm sorry, Your Honor. That was in addition to . . . We've got three versus one. But the Wolf case, once again, that was a case where they . . . It was a very particular . . . They showed that they had discriminated against Ms. Wolf many times in promotions, and the injunction in that particular case was, in the future, you can't discriminate against Ms. Wolf on the basis of her gender or in retaliation for bringing this lawsuit. And she was still working for them, right? And she was still working for them. So there was a prospect of imminent harm, et cetera. There was. And in this particular case, in our case, in the Peterson case, we do not have an imminent harm. We do not have an imminent harm situation. I think we have your argument. Thank you very much. Okay. Well, thank you very much. And I just want to say, I didn't mean to imply anything about anybody's age anywhere. We have some young hundreds of year olds and some old 20 year olds. That is true. Thank you very much.